Electronically Filed
Intermediate Court of Appeals
CAAP-18-0000417
30-MAY-2019
08:05 AM

NO. CAAP-18-0000417

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee, v.
MICHELLE GALVEZ, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIFTH CIRCUIT
(CASE NO. 5PC151000175)

MEMORANDUM OPINION
(By: Leonard, Presiding Judge, Reifurth and Chan, JJ.)

Defendant-Appellant Michelle Galvez (**Galvez**) appeals
from the Judgment of Conviction and Sentence (**Judgment**) entered
on April 27, 2018, by the Circuit Court of the Fifth Circuit
(**Circuit Court**).[1]  Following a bench trial, the Circuit Court
found Galvez guilty of Assault in the Second Degree, in violation
of Hawaii Revised Statutes (**HRS**) § 707-711(1)(b) (2014).[2]  The
charge arose out of an injury to a minor child (**Minor**) while he
was in the care of Galvez, who was operating a home daycare.

---

[1]     The Honorable Randal G.B. Valenciano presided.

[2]     At the time of the offense, HRS § 707-711(1)(b) stated:

**§ 707-711 Assault in the second degree.**  (1) A person
commits the offense of assault in the second degree if:
. . . .
    (b)     The person recklessly causes serious or
            substantial bodily injury to another[.]

I.   BACKGROUND

The evidence at trial included the following:

Minor's mother, Fawna Kiefer (**Kiefer**), testified that she secured Galvez's daycare services after seeing an advertisement on Craigslist.  Minor started attending Galvez's daycare during the last week of September 2013, at which time Minor was ten months old.  Minor was approximately twenty to twenty-five pounds and able to crawl, walk with assistance, and sit upright.  Minor was able to say small words and was able to eat small solid foods and drink out of a sippy cup on his own.

On the morning of October 24, 2013, Kiefer took Minor to Galvez's daycare.  Minor had a slight cold but was happy and breathing normally.  Later that afternoon, while she was at work, Kiefer received a telephone call from an Emergency Medical Technician (**EMT**) seeking her permission to intubate Minor because he was not breathing, which she gave.  The EMT told Kiefer to contact Galvez for additional information.

As Kiefer was leaving work to go to her son, she called Galvez and asked her what had happened.  Galvez told Kiefer that Minor had choked on something, perhaps his juice or "gala-galas",[3] and went limp in her arms.  Galvez told Kiefer that she called the ambulance right away because she was "freaking out."  When Kiefer arrived at Galvez's home, Minor had already been taken to the hospital by the EMTs.  Galvez then told Kiefer that Minor had been throwing a tantrum and he threw himself back and hit his head and was crying.  Galvez told Kiefer that she then

---

[3]     Context suggests that "gala-galas" refers to phlegm.

2

offered Minor some apple juice, after which Minor went limp, and then she called the ambulance.

Kiefer then went to Wilcox Memorial Hospital (**Wilcox**), where she saw Minor, who was convulsing and having seizures. His eyes were rolling into the back of his head and medical personnel were still trying to intubate him.  His chest was bloated and he was shaking violently.  A doctor identified a red mark behind Minor's ear, and Kiefer informed the doctor that the mark had not been there when she dropped him off at daycare. The doctor told Kiefer that they suspected Minor had suffered a head injury because one of his pupils was dilated and the other was not.

Kiefer called Galvez from the hospital and spoke with her again to get more information about what had occurred. Galvez told Kiefer that Minor "had hit his head by throwing himself back, throwing a tantrum on the floor and had hit the corner area" of a coffee table.  She told Kiefer that Minor went limp about five to ten minutes after he hit his head, during which time Galvez had tried to give him juice and food because he was crying.

Kiefer testified that at the time of trial, Minor was approximately five years old, was partially blind, suffered from seizures, and could not walk, crawl, or sit up without assistance.  Minor could not talk or use the bathroom on his own.

The State's next witness was paramedic Stacy Oho (**Oho**). Oho testified that he and his partner were dispatched to Galvez's home after emergency services received a 911 call, at

approximately 2:14 p.m. on October 24, 2013, reporting that Minor was having difficulty breathing. Oho arrived at Galvez's residence shortly after fire personnel at approximately 2:20 p.m. When Oho arrived, Minor was gasping for air. As he was working on Minor, Galvez told Oho that Minor "threw himself on the floor, hit his head, but got up, drank a cup of juice or something, and then proceeded to be less responsive or lethargic over the next so many minutes." A firefighter was able to contact Kiefer over the phone and conveyed to Oho that Minor's only relevant medical condition was that Minor had chest congestion due to a cold. Oho testified that based on his assessment when he treated Minor, using the Glasgow Coma Scale, that Minor was unconscious, unresponsive, and breathing through reflexive means. Oho stated that Oho believed Minor had sustained some type of head injury. Oho further testified that his assessment meant that Minor's cognitive and motor skills were not working. Minor was also showing signs of seizure activity. Oho arrived with the Minor at Wilcox at approximately 2:50 p.m.

The next witness was John Blaine, Jr. (**Blaine**), Galvez's boyfriend/fiancé. Blaine lived with Galvez and their minor daughter. On October 24, 2013, the day of Minor's injury, Blaine was off work and at home. Blaine testified that he did not have a clear recollection of the day's events. He did recall that on the day of Minor's injuries, he was outside, but went inside because he heard Galvez yelling. He then discovered that it appeared Minor was having difficulty breathing. Blaine testified that he saw Minor on the floor near the entertainment

center lying down with his legs folded underneath him in an odd way.  Blaine called 911 because he thought Minor was choking. Blaine testified that Galvez told him, prior to his calling of 911, that Minor had thrown himself back and hit his head.  The audio recording of the 911 call was played at trial and during that call Blaine stated that Minor was choking and had trouble breathing, but no mention was made that Minor hit his head. After hearing the recording of the 911 call, Blaine could not recall whether he had been told Minor hit his head before the call.  Blaine stated that he did not notice any physical marks on Minor other than a mark on his nose that he always had.  Blaine then testified that Galvez told him the day after the injury, October 25, 2013, that Minor had thrown himself back and hit his head on the entertainment center.

Blaine also testified that, on October 28, 2013, he created a re-enactment video at the request of law enforcement. Galvez and their four-year-old daughter also created re-enactment videos.  Blaine had not seen any of the videos.

Captain Kenneth Cummings (**Cummings**), a police officer for the Kauai Police Department, testified at trial.  On October 24, 2013, Cummings was a detective on duty and was assigned to Minor's case.  Cummings spoke with Galvez around 7:00 p.m. on the day of the incident, at her residence.  Galvez told Cummings that around noon she fed Minor, and around 12:30 p.m. she tried to put him down for a nap, but Minor was crying and throwing a tantrum. Galvez told Cummings that she asked Blaine to get Minor some juice.  Minor drank a little juice, stood up, fell down onto his

butt while still crying, and threw himself from a seated position backwards into the entertainment center, causing him to hit his head. Galvez said Minor sat back up, threw up, and then fell forward and was limp. Galvez told Cummings she ran over to Minor, picked him up, and yelled to Blaine to call 911. She then held Minor until the EMTs arrived.

Cummings testified that he helped with the video re-enactments created by Galvez and Blaine. Cummings testified there were a number of discrepancies between Galvez's and Blaine's initial statements and their re-enactments four days later. During the re-enactment, Galvez stated that Minor did not vomit after hitting his head where in her initial report she had testified that he did. In Blaine's re-enactment video, he claimed that he went into the residence and picked up Minor himself. Cummings testified that he submitted his case report on December 5, 2014, over a year after the incident, so that he could first consult with Dr. Kayal Natarajan (**Dr. Natarajan**), an expert in injuries relating to family or child abuse, who works with Kapiolani Medical Center (**Kapiolani**). Cummings provided Dr. Natarajan with investigative materials and the medical records they had available. Cummings provided Dr. Natarajan with the video re-enactments of Galvez and Blaine, but did not provide the video re-enactment of their daughter.

Dr. Natarajan is a pediatrician who, after medical school, worked in Cook County, Illinois, as a pediatrician with a subspecialty in child abuse pediatrics, and as an attending physician with the Cook County Child Protective Services

division. After returning to Hawai'i, Dr. Natarajan worked with a program associated with Kapiolani that cared for the medical needs of foster children and then at the Kapiolani Child Protection Center, where she did case reviews for the Hawai'I Department of Human Services (**DHS**). At the time of her testimony, Dr. Natarajan worked as an examining physician at Kapiolani's Sex Abuse Treatment Center and continued to do consultations at Kapiolani, as well as seeing patients and training pediatric residents at Queen Emma Clinic, where she is also an assistant professor of pediatrics. Dr. Natarajan is board certified in general pediatrics, as well as child abuse pediatrics. She testified that board certification for child abuse pediatrics is a relatively new certification with approximately 360 certifications worldwide, and to her knowledge, she is the only pediatrician so certified in Hawai'i. Dr. Natarajan was recognized by the court as an expert in general pediatrics and in the area of child abuse and neglect.

Dr. Natarajan testified that she became involved with Minor's case because she was on the multi-disciplinary team at Kapiolani Child Protection Center. She reviewed the case at the request of DHS starting in early November of 2013. As a part of her initial assessment, prior to contact with law enforcement, she reviewed Minor's records from Kapiolani, Queen's Medical Center (**Queen's**), and Wilcox. Dr. Natarajan's medical assessment and diagnosis was that Minor suffered non-accidental head trauma.

Dr. Natarajan testified that Minor suffered a skull fracture on the left back side of his head, subdural bleeding on

the right side of the brain, and extensive retinal hemorrhages in his right eye. As a result of his injuries, Minor could not breathe on his own and was unresponsive. A CT scan was performed at Wilcox, which showed bleeding and massive swelling of Minor's brain such that the brain was protruding through the base of Minor's skull. Minor was medevaced from Wilcox to Queen's, where medical personnel cut out a piece of Minor's skull to alleviate the pressure on his brain to prevent further injury. Dr. Natarajan testified that Minor suffered a subdural hematoma, which is caused suddenly right after an injury and causes the victim to "decompensate" much faster than an epidural hematoma, whereby the victim normally has a lucid time between injury and collapse. Dr. Natarajan testified that Minor had extensive retinal hemorrhaging in his right eye, which is caused when the head moves in a very strong accelerative or decelerative manner, and are seen very rarely except in motor vehicle accidents, very high falls, or shaken injuries. She testified that retinal hemorrhages are not found in accidental trauma or minor injuries. Therefore, based on the Minor's history and medical records, Dr. Natarajan concluded that the Minor suffered "nonaccidental trauma or abusive head trauma."

Dr. Natarajan testified that she reviewed Galvez and Blaine's re-enactment videos about two months after she made her initial assessment. Her review of the re-enactment videos did not cause her to change her opinion that Minor suffered non-accidental head trauma. Dr. Natarajan testified that Minor's injuries were consistent with being shaken or thrown by another

party against furniture. She did not believe that the injuries were consistent with Galvez's claim that Minor threw himself back and hit his head.[4]

Galvez exercised her right not to testify. After the close of evidence, Galvez filed a Motion for Judgment of Acquittal and/or in the Alternative, a New Trial (**Motion for Acquittal**). On February 15, 2018, the Circuit Court held a hearing to consider the motion, and it was denied.

Although Galvez had been indicted on a count of Assault in the First Degree, in violation of HRS § 707-710 (2014), the Circuit Court found Galvez guilty of the lesser included offense of Assault in the Second Degree. Galvez was sentenced to a five-year term of incarceration with a mandatory minimum period of imprisonment of one year and eight months without the possibility of parole.[5]

II.  POINTS OF ERROR

Galvez raises three points of error on appeal, contending that:  (1) the Circuit Court erred in admitting Dr. Natarajan's testimony, in particular, her expert opinion that Minor's injury was caused by someone other than himself; (2) the Circuit Court's Tachibana colloquy was constitutionally deficient; and (3) there was insufficient evidence to find Galvez guilty of Assault in the Second Degree.

_____

[4]   Naaleiniu Sabino, a co-worker of Galvez, also testified at trial regarding statements allegedly made by Galvez, after the incident, about Minor. Officer Hanson Hsu also testified regarding his recording of statements at Wilcox from two ER nurses and Kiefer.

[5]   Galvez's sentence was enhanced pursuant to HRS § 706-660.2 (2014) because Minor was less than eight years of age at the time Galvez committed the class C felony of Assault in the Second Degree.

III. APPLICABLE STANDARDS OF REVIEW

"Generally, the decision whether to admit expert testimony rests in the discretion of the trial court. To the extent that the trial court's decision is dependent upon interpretation of court rules, such interpretation is a question of law, which [the appellate] court reviews de novo." State v. Metcalfe, 129 Hawaiʻi 206, 222, 297 P.3d 1062, 1078 (2013) (quoting Barcai v. Betwee, 98 Hawaiʻi 470, 479, 50 P.3d 946, 955 (2002) (citations omitted)).

The validity of a defendant's waiver in a criminal case of the right to testify is a question of constitutional law reviewed by this court under the right/wrong standard. State v. Celestine, 142 Hawaiʻi 165, 169, 415 P.3d 907, 911 (2018) (citation omitted).

The appellate court reviews the sufficiency of the evidence on appeal as follows:

> [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

State v. Richie, 88 Hawaiʻi 19, 33, 960 P.2d 1227, 1241 (1998) (quoting State v. Quitog, 85 Hawaiʻi 128, 145, 938 P.2d 559, 576 (1997)). "'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id. (citation omitted).

10

IV.   DISCUSSION

A.   Dr. Natarajan's Testimony

Galvez argues that Dr. Natarajan's testimony exceeded the scope of her expertise when she gave her opinion as to the cause of Minor's injury and the amount of force used in causing Minor's injury.

Through Dr. Natarajan's testimony, the State introduced evidence at trial regarding the extent of the injuries suffered by Minor.  Over Galvez's objections, Dr. Natarajan testified as to her diagnosis of nonaccidental or abusive head trauma.  Dr. Natarajan testified that she diagnosed Minor as having suffered nonaccidental trauma or abusive head trauma based on Minor's (1) case history, (2) medical records, (3) subdural bleeding, (4) severe retinal hemorrhages, and (5) neurological decompensation. The Circuit Court permitted Dr. Natarajan to testify that based on her review of Minor's case history and medical records, including the severity of his injuries, that Minor's "head was injured by someone other than himself."  When Dr. Natarajan was asked specifically whether the level of force described by Galvez could be generated by the Minor himself, the court did not allow Dr. Natarajan to offer an opinion because it went beyond her expertise.  However, the court questioned Dr. Natarajan as follows:

> THE COURT: But a fair question is: Are these types of injuries consistent with an injury that some child would have if the child was shaken?
>
> And I believe her answer would be?
>
> THE WITNESS: Yes.

11

THE COURT: And then the next question would be: Are these types of injuries consistent with a child that was thrown against some furniture?

And her answer would be?

THE WITNESS: Yes, your Honor.

THE COURT: And those are fair questions. But she cannot ultimately say that this is how it happened, but she can say injuries are consistent with this type of activity.

Later, the State asked:

[THE STATE:] Are [Minor's] injuries consistent with himself having a tantrum and throwing himself into a stereo cabinet?

[DR. NATARAJAN:] In my opinion, no.

. . .

[THE STATE:] Doctor, is your expert medical opinion regarding the nonaccidental head trauma for [Minor's] injuries, is that given to a reasonable degree of medical certainty?

[DR. NATARAJAN:] Yes, it is.

This testimony was introduced over Galvez's repeated objections.

Hawai'i Rules of Evidence (**HRE**) Rule 702 (2016) provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

As noted above, Dr. Natarajan was found by the court to be qualified to provide expert testimony regarding general pediatrics and child abuse. On appeal, Galvez argues that Dr. Natarajan's testimony "went too far afield in opining that [Minor's] injuries were caused by someone else" because the State failed to qualify her as an expert in biomechanics and, without

12

such a qualification, she could not testify as to the force required to cause Minor's injuries.

"Abusive head trauma" is a relatively new diagnosis adopted by the American Academy of Pediatrics.  See Sissoko v. State, 182 A.3d 874 (Md. Ct. Spec. App. 2018) (tracing the history of the shaken baby and abusive head trauma diagnoses).

> The American Academy of Pediatrics adopted the term "abusive head trauma" in 2009 and defined it to mean the "constellations of injuries that are caused by the directed application of force to an infant or young child, resulting in physical injury to the head and/or its contents." [Sissoko, 182 A.3d at 900 (quotation marks and citations omitted).] Thus, by definition, the diagnosis involves trauma caused by human agency, which the American Academy of Pediatrics labels abusive.

People v. McFarlane, 926 N.W.2d 339, 349 (Mich. Ct. App. 2018) (emphasis added).

We note that testimony or other evidence of abusive head trauma has been admitted and/or recognized in other cases in Hawaiʻi.  See, e.g., Smith v. State, CAAP-14-0000737, 2015 WL 1959256, *7 (Haw. App. Apr. 30, 2015) (mem. op.) (denying ineffective assistance claim that failure to call opposing expert medical witness to testify that abusive head trauma could be caused by accidental fall because decision not to call was a strategic choice), cert. denied, SCWC-14-0000737, 2015 WL 4724937 (Aug. 7, 2015); Polm v. Dep't of Human Servs., CAAP-13-0004020, 2014 WL 7390879, *3 (Haw. App. Dec. 30, 2014) (mem. op.) (cause of death determined to be "abusive head trauma"); In re M. Children, CAAP-11-0000153, 2012 WL 171618, *1 (Haw. App. Jan. 20, 2012) (SDO) (autopsy report concluded child's death was from abusive head trauma and injury could have been caused by shaking and/or impact).

As explained in Sissoko, in its review of the history of the abusive head trauma diagnosis:

> It remains the prevailing view within the relevant medical communities that there are some internal findings that are highly correlated with abusive head trauma, even in the absence of external findings; and when those internal findings are coupled with an inconsistent clinical history or one that is inadequate to explain them, and cannot be explained medically, a diagnosis of abusive head trauma is supported. [See Sandeep K. Narang, M.D., J.D., A Daubert Analysis of Abusive Head Trauma/Shaken Baby Syndrome, Houston Journal of Health Law and Policy, 574-76 (2011)] (listing organizations that endorse abusive head trauma as a medical diagnosis, including the American Association for Pediatric Ophthalmology, the American College of Radiology, the American Association of Neurologic Surgeons, the World Health Organization, and the Royal College of Paediatrics and Child Health). External findings associated with abusive head trauma include bruising or swelling of the scalp or other parts of the body. Internal findings include skull fractures; long bone fractures; rib fractures; retinal hemorrhages; subdural hematomas; subarachnoid hemorrhages; brain swelling; and cervical spine injuries. As noted, the consensus is that no single finding or combination of findings is pathognomonic for abusive head trauma. Rather, a differential diagnosis must be made based upon the totality of the circumstances in each individual case. A congruence of multiple findings, each of which independently correlates with abusive head trauma, narrows the field of potential diagnoses significantly, however, and absent a clinical history of accidental trauma or evidence of a disease process consistent with those findings, a diagnosis of abusive head trauma may be made. [See Christopher S. Greeley, Abusive Head Trauma: A Review of the Evidence Base, 204 Am. J. of Roentgenology 967, 969 (May 2015)].

Sissoko, 182 A.3d at 901.

A minority of physicians and scientists have challenged this view and argue that injuries generally associated with abusive head trauma are not unique to head trauma caused by human agency and that, therefore, it is not possible to reliably conclude that particular injuries were the result of inflicted trauma. Id. at 902-03. Although there is debate between the majority and minority groups, courts continue to allow experts to offer the abusive head trauma diagnosis because it is generally accepted as a reliable diagnosis. Id. at 904-05 (collecting cases that have generally upheld the admissibility of expert

testimony opining that injuries of this nature were inflicted by human agency); see also, e.g., Wolfe v. State, 509 S.W.3d 325, 337 (Tex. Crim. App. 2017) (affirming the trial court's ruling that expert testimony that a baby presenting with subdural hematoma and retinal hemorrhages suffered abusive head trauma satisfied Daubert because that theory was "accepted within the pediatric medical community"; the experts were qualified; and the literature supported the validity of the diagnosis); In re Morris, 355 P.3d 355, 360 (Wash. Ct. App. 2015) (holding that "[a]busive head trauma as a diagnosis, and shaking as a cause of such injuries, are generally accepted theories in the relevant scientific community"); Futrell v. Commonwealth, 471 S.W.3d 258, 282-86 (Ky. 2015) (child abuse pediatrician's expert testimony that victim died as a result of abusive head trauma was admissible).

Dr. Natarajan testified that she considered Minor's case history, medical records, and injuries to arrive at her diagnosis. Dr. Natarajan testified that Minor's injuries were most consistent with a diagnosis of nonaccidental head trauma, which, as explained *supra*, is a medical diagnosis, which "by definition . . . involves trauma caused by human agency." McFarlane, 926 N.W.2d at 349. We conclude that the Circuit Court did not err or abuse its discretion in admitting Dr. Natarajan's testimony that, in her expert opinion, Minor's injuries were not consistent with Galvez's claim that Minor's injuries were self-inflicted, but were consistent with abusive or nonaccidental head

trauma, because it was within her scope of expertise. Thus, we reject Galvez's first point of error.

B.   The *Tachibana* Colloquy

Galvez argues that the Circuit Court failed to conduct a proper Tachibana colloquy because the court did not directly ask Galvez whether anyone was forcing or pressuring her not to testify. Galvez submits that, "although the trial court did inform [Galvez] about her right to testify in her case, it failed to conduct a 'true colloquy' as to whether she was voluntarily waiving her right."

Before trial commenced on January 11, 2018, Galvez was advised of her right to testify as follows:

> THE COURT: . . . . You have a constitutional right to testify in your own defense. You should consult with your attorney regarding the decision to testify. However, it is ultimately your decision, and no one can prevent you from testifying should you choose to do so.
>
> If you decide to testify, the . . . deputy attorney general . . . will be allowed to question or cross-examine you. You understand that?
>
> THE DEFENDANT: Yes, I do.
>
> THE COURT: You also have a constitutional right not to testify and to remain silent. If you choose not to testify, the jury will be instructed that it cannot hold your silence against you in deciding your case. Do you understand that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: If you testify, your credibility will be -- will be judged by the jury like any other witness. You understand that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: If you have not testified by the end of trial, I will question you to ensure it was your decision not to testify. Do you have any questions about what I just explained?
>
> THE DEFENDANT: No, your Honor.
>
> THE COURT: Ms. Galvez, have you already made a decision on whether you want to testify or whether you do not want to testify?

[DEFENSE COUNSEL:]: Your Honor, not yet.

THE COURT: Okay.  So [defense counsel] said you haven't made that decision.  Now, regarding your decision, you should confer with [defense counsel,] but it's your decision.

On January 23, 2018, before the State was finished presenting its case, the court again advised Galvez of her right to testify as follows:

THE COURT: The State has presented witnesses.  They're not done with the presentation of witnesses at this time, and the State still intends to call witnesses.

So before we get there, however, I wanted to inform you of something that the attorneys call the Tachibana rights.  We talked about this a little bit at the beginning of the trial, actually before the trial started.

And you have a constitutional right to testify in your own defense.  Although you should consult with [defense counsel], your attorney, regarding the decision -- regarding the decision to testify, it is ultimately your decision and no one can prevent you from testifying should you choose to do so.

If you decide to testify, . . . the deputy attorney general, will be allowed to question or cross-examine you on the stand, and your credibility - credibility will be tested as any other witness.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: You also have a constitutional right not to testify and to remain silent.  If you do not testify, I will not use your silence against you in deciding your case.  And the reason I say I, because I'm the fact finder in this case.

Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Regarding this matter, prior to deciding whether to testify or not, did you consult with [defense counsel] regarding your right to testify or not testify?

THE DEFENDANT: Yes.

THE COURT: And did [defense counsel] give you legal advice regarding your right to testify or not testify?

THE DEFENDANT: Yes.

THE COURT: Are you satisfied with the legal advice given to you by [defense counsel] regarding your right to testify or not testify?

THE DEFENDANT: Yes, your Honor.

THE COURT: Ms. Galvez, have you made a decision on whether to testify or not testify?

THE DEFENDANT: Not yet.

THE COURT: Okay.  So I will ask you again.  But do you have any questions of the Court regarding your right to testify or not testify?

THE DEFENDANT: No, your Honor.

THE COURT: Okay. So, [defense counsel] --

[DEFENSE COUNSEL]: Yes.

THE COURT: -- I saw you whisper, not yet, not yet, so we'll wait and then -- but it is a decision that she is going to have to make maybe as soon as Thursday.

After the State rested, Galvez's counsel indicated that they would not be calling any witnesses to testify.  The court then conducted its third and ultimate Tachibana warning:

THE COURT: Okay.  So, Ms. Galvez, can you stand, please.  Hold on.

Ms. Galvez, I'm going to do a Tachibana warning to you.  I did that twice already.  This -- I believe this will be the third time.  I could be wrong on the number.

But do you understand that under the laws of the constitution of the United States of America and the State of Hawaii, you have the right not to testify and the right to testify?  Do you understand that?

THE DEFENDANT: Yes.

THE COURT: If you testify, [the deputy attorney general] would be permitted to cross-examine you, and your credibility will be tested in the same manner as any other witness.  Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: You also have a right not to testify. And if you choose not to testify, I am the fact finder; I will not draw any inference unfavorable to you because you did not testify in this case.  Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: If you decide to testify, no one can stop you, not even your attorney.  And if you choose not to testify, no one can force you.  Do you understand that?

THE DEFENDANT: Yes, your Honor.

18

THE COURT: I believe yesterday you said that you conferred with [defense counsel] about this issue. Is that correct?

THE DEFENDANT: Yes.

THE COURT: [Defense counsel] has given you legal advice --

THE DEFENDANT: Yes.

THE COURT: -- on the issue of testifying or not testifying?

THE DEFENDANT: Yes, your Honor.

THE COURT: Are you satisfied with the legal advice given to you by [defense counsel]?

THE DEFENDANT: Yes, your Honor.

THE COURT: Regardless of the advice given to you by [defense counsel], it is ultimately your decision to decide whether you're going to testify or not testify.

You understand that?

THE DEFENDANT: Yes.

THE COURT: Have you made a decision on whether to testify or not testify?

[DEFENSE COUNSEL]: Your Honor, I -- I do apologize. I just need to talk to her for a few minutes –

THE COURT: Okay.

The court then took a five minute break and then went back on the record and the colloquy continued:

THE COURT: We're back on record. We have the attorneys and we have the defendant present. The State has rested.

Prior to taking a break, [defense counsel] had an opportunity -- the Court did inform Ms. Galvez of her <u>Tachibana</u> rights to testify or not testify. [Defense counsel] had an opportunity to confer with Ms. Galvez about her decision to testify or not testify.

[Defense counsel.]

[DEFENSE COUNSEL]: Your Honor, Ms. Galvez had -- has informed me that she will not be testifying in this case.

THE COURT: Okay. Ms. Galvez, [defense counsel] has told the Court that it is your intent not to testify, which means the case will go forward. Regarding your decision not to testify, is it your decision not to testify?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. And are you -- you have any questions of the Court regarding your decision not to testify?

THE DEFENDANT: No, your Honor.

THE COURT: And that decision you are making, is that an intentional, knowing, and voluntary decision?

THE DEFENDANT: Yes.

THE COURT: [Defense counsel], is that consistent with your understanding that Ms. Galvez is not going to testify today?

[DEFENSE COUNSEL]: That is correct, your Honor.

The right to testify is a fundamental right that the Hawai'i Supreme Court has protected by establishing the requirement that "when a defendant in a criminal case indicates an intention not to testify, the trial court must advise the defendant of the right to testify and must obtain an on-the-record waiver of this right." Celestine, 142 Hawai'i at 169-70, 415 P.3d at 911-12 (citing Tachibana v. State, 79 Hawai'i 226, 236, 900 P.2d 1293, 1303 (1995)). The on-the-record waiver assures that the defendant is "aware of [the] right to testify and that [the defendant] knowingly and voluntarily waive[s] that right." Id. at 170, 415 P.3d at 912 (quoting Tachibana, 79 Hawai'i at 234-37, 900 P.2d at 1301-04).

In Celestine, the supreme court stated:

To accomplish the purposes of a true colloquy, we have suggested that the trial court engage in a verbal exchange with the defendant at least twice during the colloquy in order to ascertain the defendant's "understanding of significant propositions in the advisement." The first time is after the court informs the defendant of the right to testify and of the right not to testify and the protections associated with these rights. The purpose of this exchange is for the court to ascertain the defendant's understanding of these important principles.

The second time we suggested a verbal exchange should occur is after the court indicates to the defendant its understanding that the defendant does not intend to testify. This inquiry enables the court to determine whether the defendant's decision to not testify is made with an understanding of the principles that have been explained to

> the defendant. As part of this inquiry, the trial court elicits responses as to whether the defendant intends to not testify, whether anyone is forcing the defendant not to testify, and whether the decision to not testify is the defendant's.

Id. at 170-71, 415 P.3d 912-13 (citations and footnote omitted).

The court then explained that:

> The constitutional right to testify is violated when the Tachibana colloquy is inadequate to provide an "objective basis" for finding the defendant "knowingly, intelligently, and voluntarily" relinquished his or her right to testify. In determining whether a waiver of the right to testify was voluntarily and intelligently made, this court looks to the totality of the facts and circumstances of each particular case.

Id. at 171, 415 P.3d at 913 (citations omitted).

The record shows that Galvez is able to read, write, and understand the English language. There are no indications in the record that Galvez had any trouble understanding the proceedings. The court specifically informed Galvez twice that no one can force her to testify. The first time, the court told Galvez, "regarding the decision to testify, it is ultimately your decision and no one can prevent you from testifying should you choose to do so." In the ultimate Tachibana colloquy, the court explained to Galvez, "if you decide to testify, no one can stop you, not even your attorney. And if you choose not to testify, no one can force you. Do you understand that?" Galvez replied, "Yes, your Honor." After Galvez took a few minutes to again consult with counsel, the court again asked Galvez, "is it your decision not to testify?" Galvez responded, "Yes, your Honor." The court then asked whether Galvez had any questions, and she responded that she did not. Finally, the court asked Galvez whether "the decision you are making, is that an intentional, knowing, and voluntary decision?" Galvez responded that it was.

In State v. Chong Hung Han, the supreme court found that the trial court's Tachibana inquiry was defective because it did not adequately establish on the record that the petitioner had understood what rights he was waiving when he agreed to the decision not to testify was his alone. 130 Hawai'i 83, 90-91, 306 P.3d 128, 135-36 (2013). The court found no "true colloquy" was conducted, rather the court simply advised petitioner of his rights without any discussion or exchange. Id. Thus, the court concluded that the colloquy did not establish "any confidence" that the defendant understood each of his rights and the court did not have an objective bases for finding a knowing, intelligent, and voluntary waiver. Id. at 91, 306 P.3d at 136. In a footnote, the supreme court contrasted the deficient Tachibana inquiry in Chong Hung Han with the constitutionally sufficient colloquy in State v. Christian, 88 Hawai'i 407, 414-15, 967 P.2d 239, 246-47 (1998). Id. at 91 n.6, 306 P.3d at 136 n.6. The supreme court approved of the colloquy in Christian, which was as follows:

> THE COURT: As I have discussed with you before the start of the trial, you do have the constitutional right to testify in your own defense. You understand?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And although you should consult with [ ] your lawyer regarding your decision to testify, it is your decision and no one can prevent you from testifying if you chose to do so . . . Do you understand?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And if you decide to testify, the prosecutor will be allowed to cross-examine you. You understand that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: You also have the constitutional right not to testify and to remain silent. You understand?

THE DEFENDANT: I understand.

THE COURT: And you understand that if you chose not to testify, that the jury will be instructed that it can not hold your silence against you in deciding your case.

THE DEFENDANT: I understand.

THE COURT: It's the understanding of the Court that you do not intend to testify in this case, is that correct?

THE DEFENDANT: That's correct

THE COURT: And that's your decision.

THE DEFENDANT: Yes.

88 Hawai'i at 414-15, 967 P.2d at 246-47.

The colloquy with Galvez is quite similar to the colloquy in Christian, but the court here further asked at the end of the colloquy whether Galvez's decision was "an intentional, knowing, and voluntary decision?" to which Galvez responded, "[y]es." We recognize that the supreme court has "suggested" that the court engage in a verbal exchange with the defendant twice. Celestine, 142 Hawai'i at 170-71, 415 P.3d at 912-13. The first time is to ascertain the defendant's understanding of her rights. Id. at 170, 415 P.3d at 912. The second time occurs after the defendant indicates he does not wish to testify, at which time the trial court should elicit "responses as to whether the defendant intends to not testify, whether anyone is forcing the defendant not to testify, and whether the decision to not testify is the defendant's." Id. at 170-71, 415 P.3d at 912-13. In this case, we conclude based on the totality of the circumstances that the colloquy with the court was such that it established with confidence that Galvez understood that no one could force her to testify or not testify and that the court had an objective basis for finding Galvez

23

knowingly, intelligently, and voluntarily gave up her right to testify.  See id. at 171, 415 P.3d at 913; Chong Hung Han, 130 Hawai'i at 91, 306 P.3d at 136.  Accordingly, we reject Galvez's second contention of error.

C.    Sufficiency of the Evidence

Galvez argues that the Circuit Court erred when it denied her Motion for Acquittal because there was insufficient evidence to find her guilty of Assault in the Second Degree.

A person commits the offense of Assault in the Second Degree if "[t]he person recklessly causes serious or substantial bodily injury to another[.]"  HRS § 707-711(1)(b).[6]  "A person acts recklessly with respect to a result of his conduct when he consciously disregards a substantial and unjustifiable risk that his conduct will cause such a result."  HRS § 702-206(3)(c) (2014).[7]

---

[6]    HRS § 707-711(1)(b) was amended subsequent to the date of the offense considered herein, October 24, 2013.  Currently, HRS § 707-711(1)(b) (Supp. 2018) provides that a person commits the offense of assault in the second degree if "[t]he person recklessly causes serious bodily injury to another[.]"

[7]    HRS § 707-206 states, in relevant part:

§ 707-206 Definitions of states of mind.
. . . .
(3)    "Recklessly."
(a)    A person acts recklessly with respect to his conduct when he consciously disregards a substantial and unjustifiable risk that the person's conduct is of the specified nature.
(b)    A person acts recklessly with respect to attendant circumstances when he consciously disregards a substantial and unjustifiable risk that such circumstances exist.
(c)    A person acts recklessly with respect to a result of his conduct when he consciously disregards a substantial and unjustifiable risk that his conduct will cause such a result.
(d)    A risk is substantial and unjustifiable within the meaning of this section if, considering the nature and purpose of the person's conduct and
(continued...)

Galvez does not contest that Minor suffered serious or substantial bodily injury. Rather, Galvez argues there was not substantial evidence that Galvez caused Minor's injuries.

Considering the evidence in the strongest light for the prosecution, the evidence at trial showed that Minor arrived at Galvez's home on October 24, 2013 a happy, healthy, and fully functional child. Sometime in the afternoon, Minor suffered a traumatic incident that caused a skull fracture, subdural bleeding, and extensive retinal hemorrhages in his right eye. Minor could not breathe on his own and he was unresponsive. Dr. Natarajan, an expert in general pediatrics and child abuse testified that, in her expert opinion, Minor suffered non-accidental or abusive head trauma that was consistent with Minor being shaken or thrown by someone against furniture. Dr. Natarajan testified that Minor's injuries were not consistent with him having a tantrum and throwing himself back into a stereo cabinet.[8]

Galvez's theory at trial was simply that Minor's injuries were caused when he threw himself back and hit his head on a piece of furniture. Galvez argues that the video re-enactment created by her four-year-old daughter at the request of

---

[7](...continued)
> the circumstances known to him, the disregard of the risk involves a gross deviation from the standard of conduct that a law-abiding person would observe in the same situation.

[8]     Galvez argues that Dr. Natarajan testified that Minor's injuries could have happened as Galvez described. This is inaccurate. Dr. Natarajan was asked if the use of force described by defendant in her video re-enactment could have caused Minor's injuries, and Dr. Natarajan agreed. However, Dr. Natarajan clearly testified that, in her expert opinion, Minor could not have caused his injuries on his own.

law enforcement supports Galvez's version of events. Even assuming that is accurate, there were a number of inconsistencies between the evidence provided to Kiefer, Oho, and law enforcement on the day of the injury and the subsequent statements given to law enforcement and the evidence at trial. For example, whether and where Minor hit his head and statements regarding the events that occurred subsequent to the injury were inconsistent. Galvez was responsible for and watching after Minor when his injuries occurred, and Blaine testified that he was not in the home. No other adults were present. It was the judge's role as the finder-of-fact to assess the credibility of witnesses, to weigh the evidence, and to reconcile conflicting evidence. See State v. Mitchell, 94 Hawai'i 388, 393, 15 P.3d 314, 319 (App. 2000). The court did not find Galvez's version of events credible.

Upon review of all of the evidence admitted at trial, and reasonable inferences therefore, we conclude that there was substantial evidence to support the court's determination that Galvez caused Minor's injuries. Accordingly, the Circuit Court did not err in denying Galvez's Motion for Acquittal and finding her guilty of Assault in the Second Degree.

V.    CONCLUSION

For these reasons, the Circuit Court's April 27, 2018 Judgment is affirmed.

DATED: Honolulu, Hawaiʻi, May 30, 2019.

On the briefs:

Emmanuel G. Guerrero,
for Defendant-Appellant.

Tracy Murakami,
Deputy Prosecuting Attorney,
County of Kauai,
for Plaintiff-Appellee.

/Presiding Judge

Associate Judge

Associate Judge